2-4-1865 Ashley Romero v. City of Lansing, Michigan et al. Oral argument not to exceed 15 minutes per side. Mr. Kamenak for the Plaintiff Appellant. Good morning, may it please the Court. Rob Kamenak, I represent the Plaintiff Appellant. Your Honors, I have reserved three minutes for rebuttal. The Court is familiar with the case under 42 U.S.C. 1983, excessive force. There are several issues. Let me get right into the constitutional tort issue. I do think that it is, and to remind the Court, this comes before the Court on a motion to dismiss. This is not a motion for summary judgment. Important point. Our contention is that it is plausible that a jury could find under these circumstances that the officer's use of force is not objectively reasonable. And the Court has undoubtedly reviewed the videos in this case. I will stress to the Court that but for the video footage that Judge Jarbo found blatantly contradicted certain allegations of the complaint, at least my reading of the District Court's opinion is that there would have been a denial of the motion to dismiss. So the videos are at least important insofar as the District Court found they contradicted the terms of the complaint. The December 1st, 2023 incident, I think the most important parts of this case are the following. Number one, there was no active resistance at all in the case. Let's just play it out a little bit. The officers do admittedly get information that a shot had been fired. I'm not denying that whatsoever. They come to the scene, though, and the guns are fully drawn. This is not a situation where the officers were surprised and we've had those kind of cases. So they're ready to go. And they start shouting commands loud. You've heard the videos, and in particular the split-screen video, R-19. And for the most part, and I think materially, you find that the decedent is in compliance. He doesn't get on the ground. He's been told several times to get on the ground. He only gets on his knees. So he's not in compliance with that command, is he? Well, if I may, Your Honor, I don't think he was in compliance with get face down. He was. I'm not trying to correct you. Face down or get on the ground, or is it both? Well, get on the ground he was because he did go down to his knees. Oh, okay. But he's also told face down, which is what the officers want them to do. I mean, they don't want them just to kneel down, do they, usually? I can't say what the officers want. I'm presuming that he's... From other cases, it's a very common command that I've seen. And I would agree with you. And we do, however, find the decedent with his hands up. Well, until he reached, until he showed his gun, and then until he reached for his gun. He did. I'm not denying that at all. And at that point in time, you know, we had to... Your position is that they had no right to shoot until he actually pointed the gun at him. I guess that's your position. Or, if I may, in an earlier instance, he didn't even draw the gun. It wasn't just a matter of pointing. Okay, that they could have shot him if he drew the gun? No, perhaps I misunderstood your point, Your Honor. Okay, at what point would you concede that the officers could use excessive force against your client? Well, from the officer's point of view, an objective officer, when he was going to use the gun. Okay, and you just say that going for the gun, touching the gun, isn't enough, that he had to do something else. In these circumstances, and I'm not hedging my comment... You would really be risking the officer's life, would you not, if we established that as a rule of law? Not... Because it could happen so fast, touching the gun and then shooting. You would have us, have the officer just wait to see if that happens? I understand the point, but we have other circumstances here as well. Number one, the decedent was not in a shooting position at all. He was on his knees. Everything that he indicated up to that point was, as I use the term in the brief, he was surrendering. He put his phones down. He did, admittedly, there were commands, the record is the record. And admittedly, he did not go face down, but he was complying with all the other commands in the case. I'm familiar with Barnes. I'm not trying to overly segment the case. I'm actually embracing the circumstances that are here. But up to that point in time, he had complied with everything. He did not get face down, I agree, and he was told three times. I'm not denying that. But everything else about the case is he was surrendering. So what is your position as to what he was doing when he was shot? Was he about to put his gun on the ground? He was reaching for the gun. He had shown the gun under his shirt by lifting up his shirt. So what is your position as to what he was doing when he was shot by the police? He was placing the gun on the ground. And why I say that, or at least a jury could find that, why I say that is because right before that time, when he did have his cell phone in his hand, and it looks like either two cell phones or a cell phone and a case to it, I can't tell for sure, because when he did slowly put them down and slide them to the officer, one can reasonably infer he was doing the same thing with the weapon. Or your question was what was he going to do with the weapon, and that's the way it came down. Is that actually the question, his subjective intent? We don't know what his subjective intent is because, unfortunately, he's passed. But do we look at the defendant's subjective intent of what he intended to do, or do we look at the objective vantage point of a reasonable officer and see objectively how a reasonable officer would interpret those actions? The latter. Do you understand there's a difference there? I understand. It's the latter. Is it the latter, that rather than looking at subjective intent, we look at objectively what a reasonable officer would interpret? Correct. Okay. And you're saying that because of what he had done vis-a-vis the cell phones, that an objective, reasonable officer should assume that he would do the same with respect to the handgun? Or at least wait to see if he was going to do the same, yes. Plus, the answer is yes. In addition to that is all the other surrounding circumstances. Again, this was not, there was no resistance. There was compliance with certain commands, no doubt. He was already on his knees. His hands were already up. He's in the classic signs of surrender. Add all that up. And that was obvious to the officers. Two, there were two officers there with guns drawn. This was not going to be, I use the vernacular, this was not going to be like the Western, where who's going to draw first. You didn't have that going on here. There was absolutely no surprise going on to the officers. They were ready to go. Isn't there also the factor of the potential harm to Ms. Romero in the car? When he is kneeling and reaches for, the first time, reaches for the firearm, is it not true that there was a potential risk not only to the officers but also to Ms. Romero? There was. I mean, from the officer's point of view. Yes, but she was in the car. They did have at least some information that she was not the, my term, and it's a bad choice of words, but she was not the target of the earlier shots that they heard. So, yes. From his vantage point where he's kneeling, car door open, has a line of sight to her as well as to the officers. Well, the line of sight was not to her. Otherwise, I agree. There was no line of sight to her. And as you look at, I'll put it from if you were looking at the scene here, he's here, the car is here, the holster is on his right. Let's presume I'm the decedent, if you're looking at me. The holster is here. I guess you could do this, arguably. Car door open. Car door, admittedly. Admittedly, but if I may, all the eye contact that you can see, it's a little hard with the video, is all directed at the officers. Do the circumstances change materially between the first shooting and the second shooting? And if so, how? Yes. It is because the threat of violence has subsided. He reached for the gun again after he had been shot, and he is on the ground. He reaches for the gun a second time, does he not? He does. He touches it, doesn't he? He's already unclear on whether he touches the gun or not. Okay. Isn't that a reasonable interpretation, is he's going for the gun, that he might use it? But he's wounded already. I know he's wounded, but why is he going for the gun? Oh, he's going for the gun to still give it to the officers is your theory. But I don't think that's a reasonable theory at all. The theory is, if you want to use the word theory because we're dealing with plausibility and the like, I understand that. The theory is it has to be intertwined with the audio, not just the visual. If you go through the audio of everything that Mr. Romero was saying, I do believe that it's plausible that a jury could find from the audio that he was just trying to explain what he was doing. What is the audio you rely on? He says, bro, bro, and what's the other one? I got you? He's on the ground, and he says, I got you? It's supposed to be a sign of surrender, I guess. I'm not sure I know all the vernacular. Well, is bro, bro a sign of surrender, too? He goes, bro, bro, I admit, I don't know what that designates for sure. I don't know what that means. I don't either, but I do think you might come to that conclusion, Your Honor. But we missed one phrase, and again, I know I'm parsing a little bit, but I'm trying to answer your question, Your Honor. Then he goes, listen, listen, okay? And then the last thing he says is he's trying to say, I've got you, and he gets shot. And I bet you could mean, I understand. As opposed to, I'm going to shoot you. That is my point. But we do get back to Judge Griffin's question that's running through, which is that we're supposed to look at this from the perspective of a reasonable officer, right?   An objective, reasonable officer in these circumstances, what would an objective, reasonable officer think? Correct. And if nothing else, and I know my time's done, if nothing else, and I know the rule of segmentation under Barnes, so I'm very familiar with that, but let's go to the last sequence when he's on the ground. Because everything else under Barnes has to be taken into consideration. He's been on the ground, universal signs of surrender, admittedly did not go face down, I admit. I think there's a question of whether he's trying to show the officers that he wasn't going to use the gun, because he had already done that with a cell phone. There is one new case here, if I could give it to the Court or not. It's a Ninth Circuit case, admittedly. It came down on June 2nd. It's called Hernandez v. City of Los Angeles. The citation is 139 Fedforth 790. It's Ninth Circuit en banc, and it deals with the continued shooting of a suspect once he's been shot and incarceration. And the suspect in that particular case was already on the ground. And what the Ninth Circuit looked at, I know it's not Sixth Circuit. I'm just giving it to the Court. I understand that. The Ninth Circuit looked at the circumstances where a suspect on the ground appeared to be wounded, and he may no longer look like a threat. And that was the exact issue in that case that came down six weeks ago. Thank you.  Just one question. I mean, isn't this case just classic textbook self-defense? If you were going to study self-defense in criminal law, wouldn't this be the case where somebody goes for a gun, puts a hand on the gun, you're allowed to use self-defense deadly force? I mean, this is classic, isn't it? No? If it's not, why not? Because, in this, because, this is our view, as we've alleged in the complaint, all the other signs of this case are surrounded. Okay, you disregard, based upon all the unambiguous signs of surrender, which are bro and whatever else we got. Not just that, but again, and I'm trying to answer the question. I'll sit down. But, and I've said it earlier, I'm being repetitive. I'm good at it. So the whole notion is that there were also visible signs. I think if we ruled in your favor here, we would create this enormous danger for all police officers, that they would not be allowed to defend themselves in the public, and the risk that we would make them incur is just totally unreasonable, and I just can't see it. Thank you, Your Honors. Thank you. Good morning, Your Honors. Michael Berger on behalf of the appellees. To begin with, Judge Griffin, I am in agreement with you. I think that this case, if it is reversed, could cause. We ruled in their way, in their favor. It's the end of police enforcement, policing activity, I think. Well, it could be said it's the end of shooting people. Well, it's the open season on the police is what it would be. It's incredible. Okay, go ahead. Good morning. I ask that you affirm. And I think the critical part of it that we need to look at first is the procedural issue, which is whether the district court properly used the video. And the one thing that I want to point out here and in the briefing is that does not seem to be in significant dispute. There are some throwaway lines from opposing counsel, indicating that the district court should not have reviewed the videos when analyzing this on a motion to dismiss. But there is no case law that's cited. There is no analysis that's cited. In fact, I think when you go through and look at the leading case in this circuit now, Bell v. City of Southfield, the district court did what it was supposed to do. Sorry, Judge Rich. I thought you were going to ask a question. And that is analyze the video because it is blatantly contradicted. In the Bell case, wonderful case showing one side where a video is not accepted and another side where the video is accepted. You look at the video that was accepted. It was dash cam video. It showed the entire incident. I'm not sure I disagree with you about whether we can see the video or consider the video, but I'm actually not sure it helps you if we do. And I guess I'm curious how it blatantly contradicts the complaint. Yes, Your Honor. And when we're going through and we're reading the allegations in the complaint, some of the things that point out, that stand out to me as I'm recalling them in my head is there is silence in the complaint as to what dispatch told the police officers. Specifically, dispatch tells the police officers this is a confirmed shooting as they were responding to a domestic violence incident. That sets off everything that's going on. That's in the video but not in the complaint. Correct. But that's not a contradiction. You're just saying it's filling in some of the context and the holes. According to Bell v. City of Southfield, it is a contradiction. I should have briefed that case better. I read it this morning. But you'll notice there is a phrase in there that plaintiff's complaint's silence as to a particular issue, what was happening between the interactions and the officers, was key in accepting the dash cam video. And I would contend to you that plaintiff's complaint in this case, not indicating that this is a confirmed shooting according to dispatch, is the same type of silence in the complaint that would amount to the permitting to use the video. Let's move beyond it and consider the video then. Do you agree that when we come to the second and final shooting, we can consider in considering whether that was objectively unreasonable everything that kind of led up to that point? Yes, you should consider everything. Would you concede that in certain circumstances, maybe not this one, but maybe this one, the actions of the officers can become more unreasonable as the event elapses? As a general proposition, yes. That's not what happened here, though? Correct. Okay, why not? When we're looking at it from this instance, unless you don't want me to, I'm going to just jump through the pointing of the guns. Answer his question. I'm sorry. You're going to do that. I think I am. I think I am. They're showing up to an incident where they're told it is domestic violence, potential shooting, confirmed shooting. They show up with their guns pointing. It's reasonable to be doing that because they have to assume that either someone has been shot, someone may be shot, they might be shot because there's definitely a gun involved. So that's reasonable under those circumstances. Then we move on to the next part where the police officers show up and Officer Moore begins commanding, get down, get down, get down. He says it five times before Mr. Romero finally complies. And Officer Kurtz has shown up and said it once before Mr. Romero complied. So there was noncompliance at that point. Wasn't that a consideration between the video and the complaint? I think the complaint said he complied with the request. Absolutely. And the video shows he did not. Exactly. There are several things in the complaint that are contradicted by the video, but that's one of them. I think that's an important one. Exactly. Yes, that also goes to it. You don't think, counsel, there's any way that the video shows compliance? Like it's absolutely foreclosed that a jury or a fact finder could find that? I believe that, and even if I did not, we're still looking at qualified immunity analysis as well. It's not clearly established that what Mr. Romero was doing amounts to compliance under the case law that's been cited in anyone's briefs. The right to be free from deadly force while complying with commands. Well, he's told to get his face down, isn't he? And he didn't comply with that, did he? Correct. And that is why it does not fall within the scope of the general case law that you had just cited, because he is told he needs to get down, and he's not getting down. But at some point he does get on his knees, correct? That is correct. He does comply at some point in part. In part. And then Officer Kurtz comes in and says, face down twice. And that's very clear. Officer Moore is not yelling over him at that point. And yet Mr. Romero decides to not do that. He decides to lift up his shirt. Would failing to get down face down justify shooting him? In other words, it's a hypo, but if the police tell you get down, get down, get down five times, and then say get down face down, and the man doesn't do that, could the man be shot? Assuming he's unarmed, I would agree that he would not be. That would be excessive force. I would agree with that. Shooting somebody for failing to comply repeatedly with, and this was in quick succession also. This is not like in the course of 15 minutes I tell you to get face down. Correct. I would agree with that. This case, of course, is different because all of a sudden he shows a gun out of nowhere and then starts reaching towards it. And then the case law in this circuit is you don't have to be staring down the barrel of a gun to be able to use deadly force. When you're going through and you're reaching towards it, man, the first thing that's going through my head as I'm watching those videos, he's going to pull it up and shoot. So what is your position as to what Mr. Romero should have done, knowing that Mr. Romero did have a gun in his waistband? Should he have just laid on the ground and then waited and said to the police as he's lying on the ground, I have a gun in my waistband, is that what he should have done?  But the question that we have here is what would an objective, reasonable officer have thought was the appropriate level of force to use under the circumstances as they are evolving in this case? Correct, and that goes to the question that was asked prior, does his subjective intent matter? No, it does not. Trying to get back to your question about the second shooting, at that point it does become reasonable because of everything that had been happening up to that point where he's showing the gun, he has not been asked to show the gun, he has not been asked to lift up his shirt to show a gun, he has not get face down. The officers can take that into the totality of the circumstances for the second time and then all of a sudden while he's laying on the ground, you can see him laying on his left side, his right hand and the gun showing on the right side. He can very easily, had he not been shot, grab that gun out of his waistband and very quickly turned it and pointed it directly at the police officers, which that in themselves and the same reason for the first shooting gives them the opportunity to use deadly force. Because again, they don't have to be staring down the barrel of a gun to be able to do so. And then on top of it, not only is it not a constitutional violation, when we're looking through the qualified immunity analysis, there is no published opinions within this circuit, there are no public opinions from the United States Supreme Court indicating that that is improper. And then when we're looking at this new case that opposing counsel just cited, this Ninth Circuit case, Hernandez v. City of Los Angeles, we're looking at a case that's decided after the incident, we're looking at it out of circuit, and then even the more recent Rivera's, Rivas Villagas v. Cortes Luna, 595 U.S. 1, 2021, the case that a lot of people are using for qualified immunity now, it even puts into question whether this circuit's precedent is sufficient to establish for the qualified immunity, something that's clearly established. This circuit actually said in Brown v. Gillis, 95 F. 4th 436, and footnote one, a 2004 case, the Supreme Court hasn't even held that binding circuit precedent clearly establishes a right. So plaintiff's counsel has not come forth with any case law showing that any of the uses of force in this particular case amounts to something that's unreasonable. In fact, we contend, for the reasons that I stated, that it was reasonable for the officers to use the force used in this case. What is your take on the, I got you? How could that be considered a threat? If someone were to point a gun at me and say, I got you, or at least be planning to point a gun at me and say, I got you, that could be conveyed as, I got you, I'm going to kill you. He wasn't pointing a gun. I agree. Someone that's reaching for a gun, I apologize. It could mean that. Is that what he meant in this case? I don't know. And his subjective intent, again, is irrelevant. But the objective, reasonable officer would understand, I got you, I got you, to mean under the circumstances. Under the circumstances. And I think an officer under these circumstances might not even give that much weight to those words because he's reaching towards the gun a second time. Wouldn't that be the kind of thing we would ask the officers in discovery? This is a motion to dismiss. I don't know. Because it's not about the officer's subjective intent either. It's about the reasonable officer in the scene. Maybe we'd ask an expert. I don't know what you guys would do in discovery, but we didn't get there in this case. I don't think an expert would help either. A lot of times, I wish I had case law on it, but legal conclusions of experts, specifically as to the gram factors, have been excluded time and time again because they don't comply with Rule 702. I don't see discovery changing anything. So, for those reasons, we ask that you affirm as to the use of force claims. We have the failure to intervene claim, which can fail for the same reasons, or it can also fail because of how quickly this incident happened, which is an element of that claim. There's no time, as you can see in the video, for any of the officers to have a conversation and say, hey, you shouldn't do that. Had they done that, they'd be dead, potentially. I didn't understand that claim from the beginning. Did both officers shoot? Simultaneously. Okay, so the failure to intervene claim, maybe I should ask the opposing counsel, is that the one officer should have told the other one not to shoot, but he shot anyway? That's my understanding. I thought that first Officer Moore shot, and then both of them shot, but that it was Officer Moore who did the first shots. As I'm playing the video in my head, I think it might have been a second, maybe not even a second, before that Officer Moore's gun goes off first. The whole thing went so fast. It's so fast. There's no time to intervene. It's really obvious from the video. And then moving on to the Monell claim, it can fail because there is no constitutional violation, as I've argued before. There's no policy or custom that you need from Monell. They don't even allege one, I don't think. It's all conclusive. They allege that they should have had better training or something, but there's no unconstitutional policy or custom that they've alleged. Correct. For those reasons, we ask that you affirm on all counts. Thank you, Your Honors. Thank you. Just a couple points on rebuttal. There's a concern here that Mr. Romero did not listen to the command to get face down. I'll tell you when he was face down, and he listened to the command when he got shot. He was face down then. The threat had subsided, and they still used deadly force. He still reached for his gun. But with guns drawn, two officers standing over him, ready to go. You're supposed to let him draw his gun? What would you have him do? He never drew his gun. No, because they shot him. But you would allow him to draw the gun, I guess. You would allow them to shoot him after he points it at him, I guess? No. That's not the law in our circuit. The threat had subsided at the time he was wounded, and he had, perhaps in a different way, but he had complied at that point because he was face down. Well, it would have subsided had he not reached for the gun while he was on the ground having been shot, and that creates a whole new threat. Okay, tell me what you would have them do then. You would wait until after he gets the gun and sees what he does with it to see if he points it at him, shoots him, or throws it away? You would require the officers to wait? How long? Depends on the facts, Your Honor. You're talking about the lives of these officers at stake. And I say this respectfully, Your Honor, but I'm also thinking about I have to think about the life of my decedent too. I understand your point. I really do. We've argued a lot of cases. It's a tragic death. I agree with that. Yeah, and I understand all that. But I would encourage the court. It's out of circuit, but it goes with a lot of what we just argued here today, especially in the last phase, the Hernandez case that I just gave you. That's my only other point on rebuttal. What is your position on whether he can or should consider the video? I think you can consider the video. The question isn't whether you can consider the video, and I think counsel and I are in agreement on this. The question is whether the video blatantly contradicts the allegations of the complaint. Under Shumate, it has to be. Under various cases, Bell, Shumate, and the like, its usage is whether or not it contradicts the allegations of the complaint. So if it doesn't blatantly contradict the allegations in the complaint and we're dealing with a complaint on the motion to dismiss phase, we should allow the case to go forward? Yes. I don't think that's right because you actually use the video in your brief. You use segments of the video in your brief. So you rely on the review. You yourself rely on the video. Well, we relied on an appeal because the district court had looked at it. Oh, okay. Okay. You're saying the district court should not have done it. No. I'm saying that the video, insofar as you can't use the video to contradict the factual allegations of the complaint unless it blatantly contradicts them. There are allegations of the complaint that we've explained in the brief, probably ad nauseam. To be candid, I know I have to stop here, that talk about all the circumstances of surrender, what the officers knew, should have known from the circumstances, didn't de-escalate, et cetera. I'm out of my time. Hypothetically then, if the video hypothetically showed your client pulling out a gun and shooting at the officers, that would blatantly contradict what your complaint said, which was that he was not doing anything that should provoke being shot by a police officer.  I.e., he was not surrendering. Another way to put it.  But it didn't. As the court knows, any question about whether it's blatantly contradict goes in favor of the plaintiff. You can get it squared away on summary judgment later on. Is there something in the video to suggest at the moment of the second shooting, does the video reflect whether the decedent actually did fling the gun away from him? It's really difficult to see the confluence of the gun going and the shots coming. I agree with Judge Griffin and all three of you that things were lickety-split. After the incident, the gun was a few feet away. Correct. Thank you. That answers the question. Thank you. Thank you for your argument. The case will be submitted.